Sonya L. Smallets, Esq. (SBN226190)
Aaron P. Minnis, Esq. (SBN202935)
Sean D. McHenry, Esq. (SBN284175)
MINNIS & SMALLETS LLP
369 Pine Street, Suite 500
San Francisco, CA 94104
T: (415) 551-0885
F: (415) 683-7157
E: sonya@minnisandsmallets.com

Attorneys for Plaintiff
CIARA NEWTON

THE UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CIARA NEWTON, | Case No.: |
| PLAINTIFF, | **COMPLAINT FOR DAMAGES** |
| | **DEMAND FOR JURY TRIAL** |
| vs. | |
| EQUILON ENTERPRISES LLC DBA SHELL OIL PRODUCTS US, | |
| DEFENDANT. | |

COMES NOW PLAINTIFF CIARA NEWTON for causes of action, and alleges as follows:

-1-

COMPLAINT FOR DAMAGES

# I. NATURE OF THE CASE

1.    This   action   is   brought   by   PLAINTIFF   CIARA   NEWTON ("NEWTON" or "PLAINTIFF"), a former employee of DEFENDANT EQUILON ENTERPRISES   LLC   DBA   SHELL   OIL   PRODUCTS   US   ("SHELL"   or "DEFENDANT"), for sex-based harassment, sex discrimination, failure to take   reasonable   steps   to   prevent   discrimination   and   harassment,   and retaliation in violation of California's Fair Employment and Housing Act ("FEHA") as well as retaliation in violation of California's Labor Code and the public policy of the state of California.

2.    NEWTON   worked   at   SHELL   as   a   refinery   process   operator. During   her   tenure,   she   was   discriminated   against   and   harassed   by supervisors and co-workers because of her gender. She was taunted with comments like, "If your pussy hurts, just stay home." Her co-workers spoke to each other using effeminate voices, which her supervisors tolerated and encouraged. She was constantly undermined, such as when her supervisor said, "women do not last long" in his department, and belittled, as when he insisted that she was not mechanically inclined, which is untrue. When she complained to human resources about discrimination and harassment, the company took no action to protect her or to correct the situation, so it continued. Meanwhile, SHELL had a sulfuric acid spill, which posed a health risk to its employees. NEWTON attempted to properly document and contain the spill, but her supervisor ordered her not to do so because, if she did, he and her co-workers would "get in trouble." Instead, he wanted her to clean up the spill without using the proper safety equipment. For these reasons, SHELL terminated NEWTON'S employment, despite the fact that she performed well at all times.

///

///

## II. PARTIES

3.    At all relevant times herein, PLAINTIFF worked for SHELL in Contra Costa County in the State of California. PLAINTIFF resides in California.

4.    SHELL is a Delaware corporation, with its principal place of business in Houston, Texas. At all relevant times herein, SHELL was PLAINTIFF's employer.

5.    During all relevant time periods, SHELL had and continues to have 5 or more employees and, as such, is an "employer" within the meaning of FEHA.

6.    Upon information and belief, the individuals whose actions are complained of herein are and/or were agents of SHELL at all relevant times and, for all purposes herein, acted within the course and scope of their employment with SHELL such that their actions and inactions are attributable to SHELL.

## III. JURISDICTION AND VENUE

7.    This Court has original jurisdiction over this action under 28 U.S.C. § 1332, in that it is a civil action between citizens of different states in which the matter in controversy exceeds, exclusive of interest and costs, seventy-five thousand dollars.

8.    This suit is brought in the United States District Court of the Northern District of California. Venue is proper in this district pursuant to FEHA, Cal. Gov. Code § 12965(b), as PLAINTIFF worked and the unlawful employment practices alleged herein were committed in Contra Costa County, which is within the Northern District of California.

## IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES

9.    NEWTON has complied with all conditions precedent to jurisdiction under FEHA. On or about May 24, 2017, within the statutory

1   period, NEWTON filed a charge of employment discrimination with the
2   Department of Fair Employment and Housing. NEWTON received a notice of
3   right to sue on that date. Therefore, all administrative prerequisites have
4   been met.

5   ## V. FACTUAL ALLEGATIONS

6       10.    NEWTON began working for SHELL on January 5, 2016 as a
7   refinery process operator. She was part of a new hire class of approximately
8   22 people, approximately 4 of whom were women.

9       11.    NEWTON performed well during training.

10      12.    In late February of 2016, Jeff Fischer, a supervisor in the OPCEN
11  department, learned that NEWTON had been assigned to his department. In
12  response, he complained to another supervisor in front of the new hires,
13  "Motherfucker! Who the hell did I piss off to have these assholes coming to
14  my department? Looks like some of these people are going to have to find a
15  new job."

16      13.    A few days later, NEWTON began training in the OPCEN
17  department, with Mr. Fischer as her assigned mentor and supervisor. Mr.
18  Fischer went out of his way to make it clear to NEWTON that he did not
19  think that she and other women belonged at the refinery.

20      14.    Mr. Fischer told NEWTON that "women do not last long in
21  OPCEN." He repeatedly described in great detail the firing of a female
22  employee, who was "walked to the gate" in tears.

23      15.    Mr. Fischer told NEWTON's co-workers that she was not
24  mechanically inclined, which is not true. NEWTON had to take and pass the
25  same mechanical aptitude test that all workers had to take in order to be
26  hired.

27  ///
28  ///

-4-

COMPLAINT FOR DAMAGES

1   16.   Mr. Fischer repeatedly questioned NEWTON about why she
2   wanted to work for SHELL; he did not ask this question of her male co-
3   workers.

4   17.   Mr. Fischer held NEWTON to a different standard than he held
5   her male coworkers. For example, Mr. Fischer counseled NEWTON for
6   arriving late at work, even though she had arranged for a co-worker to
7   cover for her, as SHELL policy allowed. A male co-worker who arrived an
8   hour late without making prior arrangements to do so was allowed to make
9   up the missed time and was not disciplined for his late arrival.

10   18.   As part of their training, NEWTON and her three male co-
11   workers spent multiple days drawing extensive, detailed flow charts of one
12   of the refinery units on white boards. After NEWTON and her co-workers
13   had worked on their flow charts for several days, NEWTON arrived at work
14   in the morning to find that her flow chart had been erased, and the words
15   "fairy dust" had been written in green on the white board. The flow charts
16   of her three male co-workers were untouched, allowing them to move
17   forward with their studies, while NEWTON had to start over.

18   19.   In April of 2016, as her classroom-based training was drawing
19   to a close, NEWTON was to complete a required walk-through, in which she
20   (and the other trainees) walked through the plant with the department
21   manager, answering questions about the refinery's systems and operations.
22   Mr. Fischer, however, insisted that NEWTON was not ready, writing a note
23   in NEWTON's disciplinary file claiming she was behind and telling the
24   department manager that NEWTON should not test because it would be a
25   waste of time. When Mr. Fischer allowed NEWTON to proceed with the walk
26   through several days later, she earned 292 out of a possible 296 points, far
27   exceeding the 80% required to earn a passing score.
28   ///

COMPLAINT FOR DAMAGES

1    20.    A few days later, NEWTON took a final written test, on which
2  she also scored well. One question asked the test-takers to circle three
3  correct answers, which NEWTON did. Mr. Fischer marked NEWTON's answer
4  as incorrect, claiming that she should have circled all four possible correct
5  answers. However, he did not mark as incorrect the answers of any of
6  NEWTON's three male co-workers, each of whom, like NEWTON, only circled
7  three correct answers.

8    21.    In late April, Mr. Fischer asked his trainees which team they
9  would like to work on, promising to take their preferences into consideration
10 in assigning them to teams. Team assignments dictated which days and
11 shifts employees worked. Mr. Fischer refused to assign NEWTON to the
12 team she had requested. He said that it would not be fair to the team,
13 because they "already have a girl" on the team. Mr. Fischer was referring to
14 a male co-worker, whom he had repeatedly described as "practically a girl"
15 because he "bitches about everything."

16   22.    NEWTON reported her concerns about the discriminatory
17 treatment that she was experiencing to Eric Perez in Human Resources on
18 several occasions. NEWTON told HR that Mr. Fischer was singling her out
19 and treating her differently. She also told Mr. Perez that Mr. Fischer had
20 said that she could not be assigned to a particular team "because there is
21 already a girl on the team." Mr. Perez took no action to address the
22 situation and discouraged NEWTON from taking any further action. He told
23 NEWTON that, unless the other trainees were willing to corroborate what
24 she reported, it was a "he said, she said" situation. He told NEWTON that
25 asking the other trainees to do so would make them uncomfortable. He
26 stressed that he believed that Mr. Fischer was "a good guy."

27   23.    After NEWTON completed the final walk-through and the written
28 test, she, like all new hires, had to spend several days working directly with

-6-

1  a process operator in order to be considered qualified. NEWTON completed
2  her training with the qualified operators, each of whom who signed off on
3  her parallel training checklist, making her a qualified operator.

4       24.  As a result of being considered qualified, among other things,
5  NEWTON became entitled to swap shifts with her teammates. Mr. Fischer
6  learned that NEWTON had arranged to swap shifts with a teammate. He
7  then asked for NEWTON's sign-off sheet, told her that the signatures she
8  had received were not acceptable, and whited out all of the signatures on
9  the sheet, rendering NEWTON unqualified and thus unable to swap shifts
10 with her teammate. FISCHER, however, had approved the parallel training
11 checklists of NEWTON's male co-workers based on the signatures of the
12 same individuals who had signed NEWTON's checklist. NEWTON brought the
13 issue to the department manager's attention, who told her that the sign-offs
14 that she had received were acceptable and instructed her to have the same
15 people re-sign the form and then re-submit it.

16      25.  On one of the days that NEWTON spent in parallel training, her
17 goggles broke. Following the instructions of her trainer, NEWTON went
18 outside with him – through an area in which wearing googles was not
19 required – in order to get a new set of goggles. NEWTON was not carrying a
20 radio at the time because she had been told that she did not need to do so
21 when her trainer was carrying one. A supervisor approached them and
22 immediately began yelling at NEWTON, saying "Fuck! Where are your
23 fucking goggles and your fucking radio! What the fuck are you doing out
24 here without that! If you want to be an operator, I'm going to treat you like
25 a motherfucking operator!" The supervisor wrote NEWTON up for not having
26 a radio and goggles. However, NEWTON's male co-workers were given
27 friendly verbal reminders from supervisors for not wearing required
28 personal protective equipment, including goggles.

-7-

1   26.   In June of 2016, NEWTON was assigned to report Cameron
2   Curran, who at that time was a temporary supervisor in the OPCEN
3   department. Mr. Curran repeatedly asked NEWTON why she wanted to work
4   at SHELL, and if she was scared to work at SHELL. He did not ask the male
5   new hire on the team these or similar questions.

6   27.   During this time period, several of NEWTON's male supervisors
7   and co-workers began speaking in high, stereotypically girly voices when
8   using the radio. This behavior continued until one of NEWTON's male co-
9   workers told them to stop.

10   28.   Shortly after NEWTON began reporting to Mr. Curran, she
11   discovered that the sight glass, or a transparent tube through which an
12   operator can observe the level of liquid in a tank, on a sulfuric acid tank
13   was not working. NEWTON reported this to Mr. Curran, who helped
14   NEWTON attempt to fix it. When they were not able to do so, they filled out
15   a work ticket to have it fixed. NEWTON reported the non-working sight
16   glass, and the fact that sight glass and gauge were not accurate, on her
17   shift reports. Mr. Curran was annoyed with her for doing so, and insisted
18   that a globe valve prevented the tank from overflowing. NEWTON told Mr.
19   Curran that, according to materials she had reviewed on the U.S. Chemical
20   Safety Board website, the tank could still overflow.

21   29.   A truck driver delivering sulfuric acid to the tank echoed
22   NEWTON's concerns, asking her why SHELL had not replaced the sight
23   glass, as it had been broken for a long time and was not safe. SHELL
24   continued to use the tank without fixing the broken sight glass.

25   30.   On July 4, a truck driver reported that there had been a sulfuric
26   acid spill the previous night in the HP2 unit. The driver told Mr. Curran that
27   he would be reporting it to his employer as an incident. Mr. Curran
28   dismissed the truck driver's concerns. The truck driver insisted that this had

1  happened before and that SHELL needed to fix the broken sight glass before
2  someone got hurt.

3          31.    NEWTON walked out to the area of the spill to assess the
4  situation and confirmed that there had been a loss of containment under
5  the sulfuric acid tank. NEWTON told the nearby workers to avoid the area,
6  and went back to the office to document the spill, inform Mr. Curran of the
7  situation, and confirm the appropriate procedure for loss containment. Mr.
8  Curran objected to NEWTON taping off the area, despite the significant size
9  of the spill.

10          32.    Mr. Curran followed NEWTON when she returned to the area to
11  tape it off, and continued to insist that there was no need to tape off the
12  area, even when NEWTON pointed out the people who were being
13  unknowingly exposed to sulfuric acid while working in the area. Mr. Curran
14  asked NEWTON if she wanted to get other operators in trouble. NEWTON
15  told Mr. Curran that she did not want to do so, but told him that people's
16  health was at risk, so they needed to tape off the area until they could
17  notify the appropriate government agency and clean it.

18          33.    While NEWTON was taping off the area, Mr. Curran went back to
19  the office and noticed that NEWTON had documented the spill in her shift
20  report as she was trained to do. Mr. Curran became quite upset. He asked
21  NEWTON if they could go for a ride. While they are alone in his truck
22  together, Mr. Curran asked NEWTON if she wanted to get him in trouble.
23  NEWTON told Mr. Curran that she did not want to get him in trouble. He
24  then asked her if she wanted to get her co-workers in trouble. NEWTON
25  again said that she did not. He told her that reporting the spill would get the
26  operator and shift supervisor into trouble, as they had not reported the spill
27  when it happened. He then ordered her to take the information on the spill
28  out of her shift report. He instructed her not to document things like this, so

-9-

that no one would get into trouble. NEWTON told Mr. Curran that she did not want to get anyone in trouble, but that she did not feel comfortable putting people's health at risk, and so she wanted to tape off the area and clean it properly.

34.    Mr. Curran pointed NEWTON toward the bags of oyster shells and said, "there you go, clean it up." NEWTON said that she wanted to follow SHELL procedure, which required them to report the spill and wear proper safety equipment while cleaning up a spill. Mr. Curran began to gather the required safety equipment, but could not locate it all. He then told NEWTON that he would clean it up himself, but she must take the spill off of her report. Feeling intimidated and scared, NEWTON followed her supervisor's direct command and removed the spill from her report and instead verbally told the next shift's operator about it. To the best of NEWTON's knowledge, the spill was never reported.

35.    The next time that NEWTON worked the night shift, an operator with whom she had never worked before approached her and warned her to "watch [her] back." He told her that her co-workers and supervisors would be "watching [her] like a hawk" and "setting traps for [her]" and that they would be looking for a way to get rid of her. He told her that she "worked with a bunch of assholes on that team," that they did not want her there, and that "they would find a way to get rid of her."

36.    Mr. Curran made seven negative entries in NEWTON's file during the next three shifts that she worked. Mr. Curran did not tell NEWTON about his concerns prior to documenting them in her file. This was contrary to SHELL policy, which required supervisors to inform employees when entries were made into the employee's disciplinary file, in order to make sure that the employee was aware of the issue and given an opportunity to improve. These negative entries were inaccurate and/or unfair.

COMPLAINT FOR DAMAGES

1      37.    For example, Mr. Curran wrote in NEWTON's file that he had
2  coached her because the oil mist reclassifier for P-5167 was full and had not
3  been drained. However, Mr. Curran approached NEWTON to point out that
4  the oil mist reclassifier was full shortly after the start of her shift. This
5  meant that the day operator had failed to properly drain it, a fact that
6  NEWTON would have discovered and remedied as soon as had arrived there
7  during her initial rounds.

8      38.    Mr. Curran subjected NEWTON's work to a higher level of
9  scrutiny than he subjected the work of her male co-worker. Mr. Curran
10  admitted this to NEWTON, and her male co-worker confirmed it.

11      39.    Throughout this time period, NEWTON continued to attempt to
12  get the training that she needed in order to increase her knowledge and
13  skills. However, her male supervisors and co-workers frequently refused to
14  answer her questions, even when they were sitting at their desks with their
15  feet up sleeping or browsing Facebook. On one occasion, a member of
16  another team showed NEWTON how to do something, even though it was
17  not his responsibility to do so. He told NEWTON that he had noticed that no
18  one on her team would help her or show her how to do anything. He also
19  told NEWTON that she needed to stop letting the men "little girl her," as he
20  had noticed that they spoke to her in a demeaning manner.

21      40.    On August 29, 2016, NEWTON arrived at work to find that a
22  sticker had been placed on her desk. The sticker showed a picture of a cat,
23  and stated, "If your pussy hurts, just stay home." NEWTON immediately
24  contacted Mr. Perez the report the sticker and to reiterate her concerns
25  about the discriminatory treatment that she has experienced. Mr. Perez told
26  NEWTON that SHELL would investigate the matter. A teammate later told
27  NEWTON that a number of team members were wearing the sticker on their
28  ///

-11-

1   hard hats and that the stickers had been made and passed out by a
2   supervisor.

3       41.    Later that day, NEWTON's new supervisor, Richard Metcalf,
4   called NEWTON into his office and asked her if she found the sticker
5   offensive. NEWTON told him that she did find it offensive. Mr. Metcalf then
6   asked her if she is "easily offended," saying that, if that were the case, he
7   would need to talk to the team about changing their language. NEWTON
8   told Mr. Metcalf that she just wanted to be able to do her job without being
9   singled out or harassed.

10      42.    Shortly thereafter, the subject of the team's morning meeting
11  was how to train the operators' "wives at home" to respond in an
12  emergency, as they do not know how to react and will "most likely panic."
13  The operators spent the meeting telling stories about their wives' failures
14  and making negative comments about women. None of the supervisors
15  attending the meeting objected to this conduct.

16      43.    On September 17, NEWTON emailed Mr. Perez to follow up on
17  her concerns regarding the sex discrimination she had experienced. She
18  reminded Mr. Perez that she had reported that a sticker had been left on
19  her desk that read "if your pussy hurts, just go home" as well as other
20  incidents in which she had been singled out. Mr. Perez responded by
21  informing NEWTON that supervisors had been notified that this type of
22  behavior would not be tolerated.

23      44.    On September 22, NEWTON had a regularly scheduled one-on-
24  one meeting with Mr. Metcalf. During the meeting, Mr. Metcalf provided
25  NEWTON with her 270-day progress report. In the report, Mr. Metcalf
26  praised NEWTON's willingness to learn, determination, honesty, and
27  integrity. Mr. Metcalf specifically stated that, based on NEWTON's
28  performance to date, he believed that she should continue in her role.

-12-

1  During their meeting, Mr. Metcalf told NEWTON that people had said
2  negative things about her, but, as her new supervisor, he wanted to give
3  her his unbiased opinion, which was that she was a good operator and that
4  her performance was right where it was expected to be. Mr. Metcalf
5  encouraged NEWTON to begin training in a second unit, which would entitle
6  her to a raise.

7  45.  On September 28, the day before the scheduled end of
8  NEWTON's probationary period, SHELL terminated her employment,
9  allegedly for "unsatisfactory performance during the probationary period."

10  46.  SHELL engaged in a pattern and practice of discrimination. Upon
11  information and belief, female refinery process operators were less likely
12  than male refinery process operators to pass probation.

13  47.  DEFENDANT's actions were undertaken for improper purposes
14  as alleged above and were willful, oppressive and in conscious disregard of
15  NEWTON's rights, and were designed and intended to cause and did, in fact,
16  cause and continue to cause NEWTON to suffer severe emotional distress,
17  pain and suffering, and substantial economic damage and, therefore, justify
18  the awarding of exemplary and punitive damages.

## VI. CAUSES OF ACTION

## FIRST CAUSE OF ACTION

**(Harassment Because of Sex and/or Gender in Violation of FEHA)**

22  48.  PLAINTIFF re-alleges and incorporates by reference each
23  paragraph previously alleged in the Complaint as if fully set forth herein.

24  49.  DEFENDANT is an employer within the meaning of FEHA.

25  50.  PLAINTIFF was an employee of DEFENDANT.

26  51.  PLAINTIFF was subjected to unwanted harassing conduct and a
27  hostile work environment because of her sex and/or gender.

28  52.  The harassing conduct was severe or pervasive.

-13-

COMPLAINT FOR DAMAGES

1       53.   A reasonable woman in PLAINTIFF's circumstances would have
2  considered the work environment to be hostile or abusive.

3       54.   PLAINTIFF considered the work environment to be hostile or
4  abusive.

5       55.   DEFENDANT is liable for the harassment because a supervisor
6  with actual or reasonably perceived authority over PLAINTIFF engaged in
7  the conduct and/or DEFENDANT, or its agents or supervisors, knew or
8  should have known of the conduct and failed to take immediate and
9  corrective action.

10       56.   PLAINTIFF was harmed.

11       57.   The harassing conduct was a substantial factor in causing
12  PLAINTIFF harm.

13  ## SECOND CAUSE OF ACTION

14  ## (Failure to Prevent Harassment and Discrimination)

15       58.   PLAINTIFF re-alleges and incorporates by reference each
16  paragraph previously alleged in the Complaint as if fully set forth herein.

17       59.   DEFENDANT is an employer within the meaning of FEHA.

18       60.   PLAINTIFF was an employee of the DEFENDANT.

19       61.   PLAINTIFF was subject to discrimination, harassment, and a
20  hostile work environment because of her sex and/or gender and/or in
21  retaliation for opposing the DEFENDANT's unlawful discriminatory practices.

22       62.   DEFENDANT failed to take reasonable steps necessary to
23  prevent the discrimination, harassment, and retaliation.

24       63.   PLAINTIFF was harmed.

25       64.   DEFENDANT's failure to take reasonable steps to prevent the
26  discrimination, harassment, and retaliation was a substantial factor in
27  causing PLAINTIFF's harm.

28  ///

-14-

COMPLAINT FOR DAMAGES

### THIRD CAUSE OF ACTION

### (Sex Discrimination in Violation of FEHA)

65.     PLAINTIFF re-alleges and incorporates by reference each paragraph previously alleged in the Complaint as if fully set forth herein.

66.     DEFENDANT is an employer within the meaning of FEHA.

67.     PLAINTIFF was an employee of DEFENDANT.

68.     DEFENDANT harassed PLAINTIFF and terminated her.

69.     PLAINTIFF's sex was a substantial motivating reason for the DEFENDANT's adverse employment actions.

70.     PLAINTIFF was harmed.

71.     DEFENDANT's conduct was a substantial factor in causing PLAINTIFF's harm.

### FOURTH CAUSE OF ACTION

### (Retaliation in Violation of FEHA)

72.     PLAINTIFF re-alleges and incorporates by reference each paragraph previously alleged in the Complaint as if fully set forth herein.

73.     DEFENDANT is an employer within the meaning of FEHA.

74.     PLAINTIFF was an employee of DEFENDANT.

75.     PLAINTIFF engaged in protected activity when she complained of sexual harassment, a hostile work environment, and sex discrimination.

76.     DEFENDANT terminated PLAINTIFF.

77.     PLAINTIFF's complaint of sexual harassment, a hostile work environment, and sex discrimination was a substantial motivating reason for the DEFENDANT's adverse employment action.

78.     PLAINTIFF was harmed.

79.     DEFENDANT's conduct was a substantial factor in causing PLAINTIFF harm.

///

-15-

## FIFTH CAUSE OF ACTION

### (Violation of Labor Code §1102.5)

80.    PLAINTIFF re-alleges and incorporates by reference each paragraph previously alleged in the Complaint as if fully set forth herein.

81.    PLAINTIFF was an employee of DEFENDANT.

82.    PLAINTIFF disclosed information that she had reasonable cause to believe disclosed a violation of, or noncompliance with, federal, state, and local statutes and regulations to a person with authority over her.

83.    PLAINTIFF refused to work under conditions that would result in a violation or noncompliance with a state or federal statute or regulation.

84.    DEFENDANT discharged PLAINTIFF.

85.    PLAINTIFF's disclosure of information and/or PLAINTIFF's refusal to work under conditions that would result in violation or noncompliance with applicable laws or regulations was a motivating reason for the discharge or other adverse actions.

86.    PLAINTIFF was harmed.

87.    DEFENDANT's conduct was a substantial factor in causing PLAINTIFF harm.

## SIXTH CAUSE OF ACTION

### (Wrongful Termination in Violation of Public Policy)

88.    PLAINTIFF re-alleges and incorporates by reference each paragraph previously alleged in the Complaint as if fully set forth herein.

89.    PLAINTIFF was an employee of DEFENDANT.

90.    DEFENDANT terminated PLAINTIFF.

91.    Said termination violated fundamental public policies as set forth in FEHA and the California Labor Code, including but not limited to Labor Code §§ 1102.5 and 6300 et seq.

92.    The termination harmed PLAINTIFF.

-16-

1

## VII. PRAYER FOR RELIEF

2      WHEREFORE, PLAINTIFF seeks, to the extent allowed by law,
3  economic damages, non-economic damages for pain, suffering and
4  emotional distress, exemplary damages, injunctive relief, legal interest,
5  statutory attorney's fees, expert witness fees, and costs of suit.  PLAINTIFF
6  also seeks such other relief as the court deems just.

7

8  DATED: July 13, 2017

9                                              MINNIS & SMALLETS LLP

10

11                          by: _____

12                                              SONYA L. SMALLETS, ESQ.
                                                Attorneys for Plaintiff
13                                              CIARA NEWTON

14

15

16

17                          **JURY TRIAL DEMAND**

18      Pursuant to Rule 38 of the Federal Rules of Civil Procedure, PLAINTIFF
19  demands a trial by jury in this action of all issues triable.

20
   DATED: July 13, 2017
21

22                                              MINNIS & SMALLETS LLP

23

24                          by: _____

25                                              SONYA L. SMALLETS, ESQ.
                                                Attorneys for Plaintiff
26                                              CIARA NEWTON

27

28

-17-

COMPLAINT FOR DAMAGES