UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| **Ciara Newton,**<br><br>        Plaintiff,<br><br>    vs.<br><br>**Equilon Enterprises, LLC dba Shell Oil Products US,**<br><br>        Defendant. | Case No.: 17-cv-3961-YGR<br><br>**Order:**<br>**(1) Denying Defendant's Renewed Motion For Judgment As A Matter Of Law, For A New Trial, For Remittitur, Or To Alter Or Amend The Judgment**<br><br>**(2) Denying Plaintiff's Motion For Review Of Taxation Of Costs**<br><br>**(3) Granting In Part Plaintiff's Motion For Attorneys' Fees**<br><br>Dkt. Nos. 292, 304, 332 |

On December 19, 2018, the jury returned a unanimous verdict in favor of defendant Equilon Enterprises LLC ("Equilon"), on plaintiff Ciara Newton's claims for discrimination, Fair Employment and Housing Act ("FEHA") retaliation, and whistleblower retaliation under California Labor Code section 1102.5, and in favor of plaintiff on her claims for harassment based upon gender and failure to prevent harassment. (Dkt. No. 248.) After phase two of their deliberations, on December 20, 2018, the jury returned a verdict awarding plaintiff $475,000 for past and future mental suffering and emotional distress, but found that plaintiff had not established knowledge, authorization, or ratification as a predicate for punitive damages. (Dkt. No. 253.)

Presently pending before the Court are the following motions: defendant's Renewed Motion for Judgment as a Matter of Law, for a New Trial, for Remittitur, or to Alter or Amend the Judgment (Dkt. No. 304); plaintiff Ciara Newton's Motion for Attorneys' Fees (Dkt. No. 292); and plaintiff's Motion for Review of Taxation of Costs (Dkt. No. 332). Having fully considered the papers filed in support of and in opposition thereto, and for the reasons stated herein, the Court **Orders** that:

The renewed motion for judgment as a matter of law, or in the alternative for a new trial, for remittitur, or to alter or amend the judgment is **DENIED**.

The motion for attorneys' fees is **GRANTED IN PART** and plaintiff is awarded reasonable attorneys' fees in the amount of **$841,543.73** and costs not otherwise awarded on her costs bill in the amount of **$20,389.04**.

The motion for a review of taxation of costs is **GRANTED IN PART**, and plaintiff is awarded **$7,406.34** for trial transcripts and **$5,885.63** for videotaped depositions previously disallowed by the Clerk on her costs bill.

### DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, OR IN THE ALTERNATIVE FOR A NEW TRIAL, FOR REMITTITUR, OR TO ALTER OR AMEND THE JUDGMENT

By its motion, defendant seeks an Order: (a) entering of judgment in Equilon's favor plaintiff's First Cause of action for sexual harassment and Fourth Cause of Action for failure to prevent harassment; (b) a new trial on plaintiff's First and Fourth Causes of Action; (c) a remittitur of damages awarded by the jury to a sum of no more than $25,000; or (d) an amendment of the judgment to reduce the damages herein to no more than $25,000. Defendant seeks this relief on the grounds that: (1) a reasonable jury would not have a legally sufficient evidentiary basis to find in favor plaintiff on her First or Fourth Causes of Action, or to award the damages that were awarded; (2) the liability verdict was the result of prejudicially erroneous jury instructions; (3) the damages verdict was the result of erroneous instructions; (4) the damages verdict was the result of plaintiff's counsel's prejudicial misconduct, and/or passion and prejudice; and (5) the damages were excessive and against the clear weight of the evidence.

## I.   APPLICABLE STANDARDS

In order to grant a motion for new trial under Rule 59, the trial court must find that "the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice." *Passantino v. Johnson & Johnson Consumer Prods.,* 212 F.3d 493, 510 n. 15 (9th Cir. 2000). "Upon the Rule 59 motion of the party against whom a verdict has been returned, the district court has the duty . . . to weigh the evidence as [the court] saw it, and to set aside the verdict of the jury, even though supported by substantial evidence, where, in [the court's]

conscientious opinion, the verdict is contrary to the clear weight of the evidence." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (internal quotation omitted). Thus, in connection with a motion for new trial, "[t]he judge can weigh the evidence and assess the credibility of witnesses, and need not view the evidence from the perspective most favorable to the prevailing party." *Landes Constr., Co., Inc. v. Royal Bank of Canada,* 833 F.2d 1365, 1371–72 (9th Cir. 1987) (quoting 11 Wright & Miller, *Fed. Prac. & Proc.* § 2806, at 48–49). While there is no set formula, the Ninth Circuit has held that the Court should grant the motion for new trial "[i]f, having given full respect to the jury's findings, the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.*; *see also O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 420 F. Supp. 2d 1070, 1075 (N.D. Cal. 2006) *aff'd,* 221 F. App'x 996 (Fed. Cir. 2007) (same). Where multiple theories could support the verdict, sufficient evidence as to any of one of them will defeat a motion for new trial. *See McCord v. Maguire*, 873 F.2d 1271, 1273–74 (9th Cir.), *opinion amended on denial of reh'g,* 885 F.2d 650 (9th Cir. 1989) ("When a general verdict may have rested on factual allegations unsupported by substantial evidence, we will uphold the verdict if the evidence is sufficient with respect to any of the allegations."); *Weaving v. City of Hillsboro*, 763 F.3d 1106, 1121 (9th Cir. 2014) (same); *S.E.C. v. Todd*, 642 F.3d 1207, 1213 n.1 (9th Cir. 2011) (on motion for new trial, where four independent factual bases supported the jury verdict, reviewing sufficiency of evidence for all four bases not necessary).

Similarly, a court must "allow substantial deference to a jury's finding of the appropriate amount of damages" and "must uphold the jury's finding unless the amount is grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork." *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 95 F.3d 1422, 1435 (9th Cir. 1996).

A more stringent standard applies to a motion for judgment as a matter of law after a verdict pursuant to Rule 50(b). In reviewing a renewed motion for judgment as a matter of law under Rule 50(b), the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *Josephs v. Pacific Bell,* 443 F.3d 1050, 1062 (9th Cir. 2006). "The test applied is whether the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Id.* "A jury's verdict must be upheld if it is supported

3

by substantial evidence." *Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1227 (9th Cir. 2001) (emphasis supplied) (further explaining that "[s]ubstantial evidence is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion from the same evidence"). The court may not weigh evidence or order a result it finds more reasonable if substantial evidence supports the jury verdict. *Mosesian v. Peat, Marwick, Mitchell & Co.,* 727 F.2d 873, 877 (9th Cir. 1984). While the court should review the record as a whole, "it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 151 (2000). A motion under Rule 50(b) cannot be granted unless "the evidence permits a reasonable jury to reach only one conclusion . . . and that conclusion is contrary to the jury's verdict." *Martin v. California Dep't of Veterans Affairs*, 560 F.3d 1042, 1046 (9th Cir. 2009) (internal citations and quotation marks omitted).

## II. DISCUSSION

### A. Lack of Substantial Evidence of Harassment or Failure to Prevent Harassment

#### 1. Harassment on the Basis of Gender

Defendant argues that there was no substantial evidence to support the jury's verdict on her harassment claim because the evidence on which she relies largely was not gender-based or linked to bias, and most events took place outside of the applicable statute of limitations period. Here, plaintiff filed her complaint with the Department of Fair Employment and Housing on May 24, 2017, and the statute of limitations is one year. Cal. Gov't Code § 21960(d). Thus, defendants argue that events occurring prior to May 24, 2016 cannot be considered to establish the gender harassment claim.

An employer may be held liable for hostile environment harassment "created by one or more supervisors with immediate authority over the plaintiff." *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1096 (9th Cir. 2008); *see also State Dept. of Health Services v. Sup. Ct. (McGinnis)*, 31 Cal.4th 1026, 1041 (2003) ("*by implication* the FEHA makes the employer strictly liable for harassment by a *supervisor*."). Where a defendant's "supervisors played a significant role in creating the environment, making it clear to [the plaintiff] on more than one occasion that women were not welcome on the work site," a reasonable jury can find the defendant liable for harassment. *Id*.

4

Under the continuing violations doctrine, "an employer is liable for actions that take place outside the limitations period if these actions are sufficiently linked to unlawful conduct that occurred within the limitations period." *Yanowitz v. L'Oreal USA, Inc.,* 36 Cal.4th 1028, 1056 (2005). A continuing violation may be established by a series of related acts against a single individual. *Morgan v. Regents of the Univ. of Cal.,* 88 Cal.App.4th 52, 64 (2000).[1] The continuing violation doctrine applies when an employer's unlawful acts are: (1) sufficiently similar in kind; (2) have occurred with reasonable frequency; and (3) have not acquired a degree of permanence. *Richards v. CH2M Hill, Inc.*, 26 Cal.4th 798, 823 (2001). "Cases alleging a hostile work environment due to racial or sexual harassment are often found to come within the continuing violations framework" since a hostile environment claim, by its nature, often concerns an ongoing course of conduct rather than a single, discrete act. *Morgan,* 88 Cal.App.4th at 65; *see, e.g.*, *Sanders v. Dania Inc.*, No. CV-01-33-HU, 2001 WL 34736295, at *20 (D. Or. Dec. 6, 2001) (finding sufficient evidence of a continuing violation where "most of the ten incidents expressly involve a common type of discrimination: . . . racial harassment . . . [and] different supervisors perpetuated or condoned the acts at different times . . . [indicating that the incidents] are not isolated, sporadic, or discrete.").

The jury heard substantial evidence from which it could conclude that conduct by Jeffrey Fischer that occurred prior to May 24, 2016, was sufficiently linked to his and others' conduct within the limitations period. Prior to May 24, 2016, Fischer stated that "women don't last long" in the Op-Cen department where plaintiff was assigned. (Trial Tr. Vol 2 at 401.) He challenged the reasons for plaintiff's hiring, stating "who would hire you," "you must have put on a good show," and "things would have been different if he did the hiring." (Trial Tr. Vol. 2 at 10-20.) Fischer told plaintiff she was not "mechanically inclined," even though she passed the same mechanical aptitude test that all operators had to take in order to be hired. (Trial Tr. Vol. 3 at 431-32.) Fischer also told

---

[1] Defendant cites *Morgan* for the proposition that the conduct at issue for purposes of a continuing violation must also be committed by the same individual. Defendant misreads *Morgan*, which held that continuing violations may be shown in a number of ways, but under the circumstances, each of the decisions not to rehire plaintiff, made by different decisionmakers with no apparent connection between them, had a degree of permanence which should have put him on notice that he must assert his rights. *Morgan*, 88 Cal. App. 4th at 67.

her she could not be assigned to a team because they "already had a girl" referring to a male employee he said was "basically a girl . . . [because he] bitches all the time." (Trial Tr. Vol. 2 at 398.)  Fischer repeatedly told plaintiff that "women don't make it" and "women don't last long" in his department. (Trial Tr. Vol. 2 at 401.)

After that May 24, 2016, plaintiff testified that on May 27, 2016, Fischer "asked to see my checklist and he told me that I wasn't qualified, and he took a whiteout and whited out all of the guy[s'] signatures who had signed off on my list," even though the same signatures were accepted on her male co-workers' checklists.  (Trial Tr. Vol. 3 at 442.)[2]

With respect to other supervisors, plaintiff testified that, after May 24, 2016, Cameron Curran, repeatedly asked her if she was scared, if she was sure she wanted to work at the refinery, and whether her husband thought it strange or was bothered by her working there. (Trial Tr. Vol. 3 at 450-452.)  On August 29, 2016, plaintiff testified that her then-supervisor Richard Metcalf held a daily team safety meeting in which the topic of the conversation was "train your wives so they don't panic because they don't know how to react in the case of an emergency."  (Trial Tr. Vol. 3 at 508.) Plaintiff perceived the conversation as "being offensive because it was just a lot of categorizing that women were not able to react under pressure."  (Trial Tr. Vol. 3 at 508.)

Also on the morning of August 29, 2016, plaintiff found the "stay home" sticker[3] left on her desk, just before that morning safety meeting.  Some of plaintiff's male co-workers wore the sticker on their hardhats.  (Trial Tr. Vol. 1 at 138-139; Vol. 5 at 870.)  After being told about the sticker by another supervisor, later that day Metcalf called plaintiff into his office and asked if plaintiff found

---

[2]  Plaintiff testified that the white out incident took place on "Friday, May 27, 2016." (Trial Tr. Vol. 3 at 443.)  Plaintiff testified, with a 2016 calendar in front of her, that she recalled the exact date the incident occurred because it was "the weekend before the Memorial Day weekend" and she had arranged to take Saturday off for a wedding.  (*Id.*)  Defendant argues that plaintiff's testimony actually must have meant *one week earlier* (*i.e.*, May 20, 2016), since Memorial Day fell on May 30, 2016, and the "*weekend before* Memorial Day weekend" would have been May 21-22, 2016.  The checklist itself shows a "complete" signature date of May 23, 2016.  (Tr. Exh 15.)  Whiting out the date a week before it was written seems exceedingly unlikely.  Leaving aside the convoluted logic of defendant's argument, the jury was charged with determining whether this incident was within the time period.

[3]  The sticker read "If your pussy hurts, just stay home" with a picture of a cat.  (Tr. Exh 1.)

the sticker offensive, to which she said "yeah." (Trial Tr. Vol. 3 at 506.) Plaintiff testified that Metcalf then asked her "are you easily offended" and said he:

> needed to know because I'm going to have to talk to these guys about changing the way they talk. They have been working on this team for so long and, if they need to change the way they talk, I'm going to have to let them know.

(Trial Tr. Vol. 3 at 507.) Plaintiff responded that she was not easily offended and "just wanted to do my job and go home and not be . . . singled out." (*Id.*)

Ultimately, defendant's motion rests not on a lack of substantial evidence, but on defendant's own interpretation of that evidence. Defendant cites to testimony by employees Jose Navarro and Patrik Neuman that they never witnessed Fischer disparaging or treating plaintiff differently on account of her gender, while discounting that the jury also heard plaintiff's testimony to the contrary. Similarly, defendant recounts trial testimony about various incidents solely to characterize them as "gender-neutral," "managerial activity," or "simply someone's observation," rather than evidence of a hostile work environment. For instance, defendant's witness, Jose Navarro, testified that "[t]he only thing I heard [Fischer] say [about women] was that typically women don't last long in OpCen and that they tend to leave or [t]hey don't make it in the department." (Trial Tr. Vol. 5 at 857.) Defendant argues that this testimony did not mean Fischer did not *want* women in OpCen, or did not think women were *capable* of making it in the department, so it could not be evidence of bias against women. However, it is the jury's purview to decide what the evidence means, whether it is credible, and how to weigh it.

### 2. Failure to Prevent Harassment

Moreover, plaintiff presented substantial evidence to support the jury's finding on failure to prevent harassment. "The most significant immediate measure an employer can take in response to a sexual harassment complaint is to launch a prompt investigation to determine whether the complaint is justified." *Swenson v. Potter*, 271 F.3d 1184, 1193 (9th Cir. 2001). The investigation "can itself be a powerful factor in deterring future harassment . . . [since it] puts all employees on notice that [the employer] takes such allegations seriously and will not tolerate harassment in the workplace." *Id.*

Here, the substantial evidence included Equilon's failure to take reasonable steps to prevent harassment. In response to the "stay home" sticker incident, the jury heard evidence that Equilon failed to take any steps to investigate the sticker incident and discipline any employee for it and that Equilon failed to take reasonable steps to prevent harassment at the refinery. (Trial Tr. Vol. 1 at 71-74, Vol. 2 at 262, 329-30.) More than that, *prior* to the sticker incident plaintiff reported to her superiors that she felt she was being subjected to unfair, differential treatment. Specifically, on August 2, 2016, plaintiff met with Human Resources representative Christine Layne. Plaintiff explained in that meeting that Fischer had told her "women don't make it" and "women don't last long" in OpCen, that "you can't go on that team because you're a girl," and constantly threatened to "walk her to the gate" (*i.e.* terminate her) like another female operator who had been walked to the gate in tears. (Trial Tr. Vol. 3 at 500.) Rather than let plaintiff say anything more about what had happened, plaintiff testified Christine Layne told her to "stop right there" and "think about what you're doing," because "you are making some very serious accusations." (*Id.* at 500-01.) Layne did nothing to follow up or investigate plaintiff's concerns or the incidents with Fischer. (Trial Tr. Vol. 2 at 327-30.) Plaintiff further testified that when she told her supervisor, Eric Perez, about these same incidents about a month before the August 2 meeting, Perez told her it was just hearsay unless she could get her male co-workers in her training group to corroborate her story. (Tr. Vol. 3 at 501-02.)

Based upon Equilon's failure to investigate plaintiff's complaints of unfair treatment, failure to investigate the sticker incident, and the implicit message that the company put the onus on plaintiff to get her co-workers (who were also on probation at the time) to speak up against their superior rather than do any investigation itself. The jury had more than sufficient evidence to conclude that defendant "failed to take all reasonable steps to prevent harassment."

**B. Erroneous Instructions On Liability Standard**

*1. Harassment Instruction*

Defendant next argues that the Court substantially and prejudicially deviated from the standard California Judicial Council-approved model Civil Jury Instruction on "Harassing Conduct" (CACI 2523) when it instructed the jury that:

Harassing conduct may include, but is not limited to, any of the following:

a.  Verbal harassment, such as obscene, demeaning, derogatory, or intimidating language;
b.  Visual harassment, such as offensive posters, objects, cartoons, or drawings; or
c.  *Other hostile or abusive social interactions*

(Dkt. No. 238 at 8, emphasis supplied; *see* Trial Tr. Vol. 6 at 1117:17-25.)  Defendant contends the "other hostile or abusive social interactions" language misstates California law and creates an inference that any unpleasant conduct can be used to establish harassment.  Specifically, defendant urges that the phrase "hostile social interactions" drawn from the California Supreme Court's decision in *Roby v. McKesson Corp.*, 47 Cal.4th 686 (2009), was simply a summary label for the more specific types of conduct encompassed by CACI 2523, not an additional category of behavior to be included in the definition of harassing conduct.  Defendant thus urges that the "other" category was sufficiently vague as to invite the jury to attempt to fill the conceptual gap, and to sweep any offensive conduct up into the "harassment" claim.

The CACI 2523 model instruction contemplates modifications to tailor the instruction to fit plaintiff's theory of the case consistent with the case law.  Thus, the model provides:

Harassing conduct may include, but is not limited to, [any of the following:]

[a. Verbal harassment, such as obscene language, demeaning comments, slurs, [or] threats [or] *[describe other form of verbal harassment];]* [or]

[b. Physical harassment, such as unwanted touching, assault, or physical interference with normal work or movement;] [or]

[c. Visual harassment, such as offensive posters, objects, cartoons, or drawings;] [or]

[d. Unwanted sexual advances;] [or]

[e. *[Describe other form of harassment if appropriate, e.g., derogatory, unwanted, or offensive photographs, text messages, Internet postings]*.]

The Court modified CACI 2523 by deleting sections [b] and [d] which were not at issue in this case.[4] Section [e] calls for an instruction describing the other forms of harassment specific to plaintiff's

---

[4]  The Court also modified section [a] by deleting "comments, slurs, [or] threats" and modifying "language" to include "intimidating" or "derogatory."  Defendant does not object to these modifications of the standard instruction.

theory of the case. The Court thus instructed the jury that harassing conduct could include "other hostile or abusive social interactions."

As noted, the case law supporting the Court's instruction comes from the California Supreme Court's decision in *Roby, supra,* a case specifically cited in CACI 2523's annotations. The *Roby* court held that evidence of harassment can include "bias that is expressed or communicated through interpersonal relations in the workplace," "hostile social interactions," and "abusive messages that create a hostile working environment." *Id.* at 707-09. The court found that evidence of a supervisor engaging in daily "rude comments and behavior" toward plaintiff, "shunning" her during staff meetings, "belittling" her work, making demeaning comments, gestures, and facial expressions related to her disability, and reprimanding her in front of her coworkers was "sufficient to allow the jury to conclude that the hostility was pervasive and effectively changed the conditions of Roby's employment." *Id.* at 710 *(citing Lyle v. Warner Brothers Television Productions*, 38 Cal.4th 264, 278–279 (2006)); *see also Pantoja v. Anton,* 198 Cal.App.4th 87, 130 (2011) (finding that a trial court should have given additional jury instruction to "make clear that abusive language or behavior of many kinds, not only sexual innuendo or gender-related language, can create an actionable hostile working environment if motivated by gender bias").[5]

Contrary to defendant's argument, CACI 2523 sections [a]-[c]—which focus on obscene language, slurs, threats, unwanted touching or physical assault, and offensive visual representations—do not capture the conduct discussed in *Roby* as "hostile social interactions." Had the Court given only the instructions in sections [a]-[c], without further explanation of harassing conduct, it would have risked misleading the jury. Under similar circumstances, the California Court of Appeal reversed a defense judgment, finding that a jury instruction limited along the lines of sections [a]-[c] to be:

---

[5] Further, the *Roby* decision affirmed that, while harassment and discrimination are treated as separate claims under FEHA such that "harassment is generally concerned with the *message* conveyed to an employee, and . . . the social environment of the workplace, whereas discrimination is concerned with explicit changes in the terms or conditions of employment[,]. . . . nothing in the FEHA requires that the evidence in a case be dedicated to one or the other claim but never to both." *Id.* at 708, 710 (emphasis in original). Thus, the evidence defendant characterizes as nothing more than "gender-neutral management conduct," such as "coaching" plaintiff by yelling at her about wearing safety goggles or whiting out signatures on a qualification checklist, nevertheless may be considered as part of the harassment analysis.

misleading *under the circumstances of this case.* Without some form of clarification, the instruction could have caused the jury to draw the inference that harassing conduct or comments motivated by a gender-based discriminatory intent do not amount to an actionable hostile environment unless there is "sexual innuendos" or "gender-related language." This inference would be incorrect because abusive conduct that is not facially sex specific can be grounds for a hostile environment sexual harassment claim *if it is inflicted because of gender,* i.e., if men and women are treated differently and the conduct is motivated by gender bias.

*Pantoja*, 198 Cal.App.4th at 130.  The court there held that the problem could have been corrected by instructing the jury that verbal abuse and hostility alone did not constitute actionable harassment but could be actionable "*if motivated by gender bias.*"  *Pantoja*, 198 Cal.App.4th at 132 (emphasis in original).

Here, the jury was instructed on the meaning of "harassing conduct" in the context of an instruction requiring them to find both that plaintiff was "subjected to unwanted harassing conduct because she was a woman" and that "the harassing conduct was severe or pervasive."  (Dkt. No. 238 at 8.)  Thus, the instruction on plaintiff's harassment claim, considered in full, properly allowed the jury to consider hostile or abusive conduct not expressly sexual or gender-based on its face, while still cabining conduct motivated by gender bias.[6]

Further, here, the jury heard evidence of supervisors engaging in conduct or making statements that were not expressly "obscene, demeaning, derogatory, or intimidating language" as stated in section [a] of CACI 2523, but that could nevertheless, under *Roby*, constitute harassing conduct if the jury found they were "rude," "belittling," or "hostile social interactions" that amounted to "bias . . . expressed or communicated through interpersonal relations in the workplace."  The instruction was properly tailored to the theory of harassment argued by plaintiff and supported by California law.[7]

---

[6]  While defendant argues that the Court's "other hostile or abusive social interactions" formulation was too vague, the Court would have risked too strongly emphasizing plaintiff's theory of the case had it settled on a formulation more specific to the alleged harassment at issue in this case, such as conduct and language indicating plaintiff did not have the ability, qualifications, or temperament to perform her job on account of her gender.  The more generic phrasing was consistent with the case law as well as fair and neutral to the parties.

[7]  In addition, given that evidence existed to support a finding of harassing conduct based upon verbal harassment *(e.g.,* "women don't make it," "women don't last long," wives will panic and do not know how to react in an emergency, the team "already had a girl," inquiring whether the supervisor "needed to" to the male employees about changing the way they talked at work if plaintiff

11

### *2. Failure to Investigate Instruction*

Defendant next argues that the Court's "failure to investigate" instruction compounded the error in its harassment instruction. Defendant contends that the Court's instruction, in connection with plaintiff's gender discrimination and retaliation claims, that "[t]he lack of an investigation may be considered evidence that Ciara Newton's gender was a substantial motivating reason for defendant's decision to terminate her," invited a false inference that failure to conduct an investigation could also establish plaintiff's harassment or failure to prevent harassment claims.

The "failure to investigate" instruction about which defendant complains was one portion of the instruction entitled "'Substantial Motivating Reason' For Purposes of Gender Discrimination (Second Claim) and FEHA Retaliation (Third Claim)." The full instruction stated:

> As used in the instructions ***for the Second and Third Claims***, a "substantial motivating reason," like a "substantial factor," means a reason that actually contributed to Ciara Newton's ***termination***. It must be more than a remote or trivial reason. It does not have to be the only reason motivating the ***termination***.
>
> Even if the person or persons who made the ultimate decision ***to terminate*** Ciara Newton did not hold any discriminatory or retaliatory intent, you may still find that gender discrimination or retaliation was a "substantial motivating reason" for defendant Equilon Enterprises, LLC dba Shell Oil Products US's ***decision to terminate*** Ciara Newton if she proves:
>
> (a) gender discrimination or retaliation was a substantial motivating reason for recommending her ***termination*** or providing information supporting her ***termination***; and
> (b) the recommendation or information actually contributed to the ***decision to terminate*** her.
>
> The lack of an investigation may be considered evidence that Ciara Newton's gender was a substantial motivating reason for defendant's ***decision to terminate*** her.

(Dkt. No. 238 at 12, emphasis supplied; *see* Trial Tr. Vol. 6 at 1122:12-1123:6.)

The Court's instruction on the Fourth Claim for failure to prevent harassment followed next in the order of the jury instructions provided. The instruction on the Fourth Claim was drawn directly from CACI 2527 and stated:

//

//

---

was "easily offended") and visual harassment *(e.g.,* the "stay home" sticker), defendant has not shown that any error was prejudicial.

To establish this claim, Ciara Newton must prove all of the following:

1. That Ciara Newton was an employee of defendant;
2. That Ciara Newton was subjected to harassment, discrimination, or retaliation in the course of her employment;
3. That defendant failed to take all reasonable steps to prevent harassment, discrimination, or retaliation;
4. That Ciara Newton was harmed; and
5. That defendant's failure to take all reasonable steps to prevent harassment, discrimination, or retaliation was a substantial factor in causing Ciara Newton's harm.

A "substantial factor" in causing harm is a factor that a reasonable person would consider to have contributed to the harm. It must be more than a remote or trivial factor. It does not have to be the only cause of the harm.

(Dkt. No. 238 at 13; *see* Trial Tr. Vol. 6 at 1123:7-25.)[8]

As indicated above, the "Substantial Motivating Reason" instruction repeatedly limited its applicability to the termination decision in the Second and Third Claims. Thus, Defendant's argument that the jury would misunderstand the "Substantial Motivating Reason" instruction as applying not just to those termination claims but also to the Fourth Claim for failure to prevent harassment, defies logic. Indeed, the California Court of Appeal in *Alamo v. Practice Mgmt. Info. Corp.*, 219 Cal. App. 4th 466 (2013) specifically noted that the instruction in CACI 2527 "should only be given after the appropriate instructions on the underlying claim for harassment . . . which separately describe the standard of causation" for the "subjected to harassment" element of this claim. *Id.* at 470. The argument also assumes that the jury did not follow the instructions it was given, an assumption the Court is unwilling to make. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000) ("A jury is presumed to follow its instructions.").

Further, in recognizing that a claim under California Gov't Code section 12940(k) for failure to prevent harassment is a separate claim from the harassment itself, the Ninth Circuit has held that "the duty to investigate is an affirmative obligation" under section 12940(k). *Tritchler v. Cty. of Lake*, 358 F.3d 1150, 1155 (9th Cir. 2004). Thus, even assuming the jury imported the notion that

---

[8] Defendant cites to *Bradley v. Dep't of Corr. & Rehab.*, 158 Cal. App. 4th 1612, 1630 (2008), as establishing the standard for a failure to prevent claim only requires "immediate, effective corrective action." However, *Bradley* concerned the statutory provision regarding "failure to take prompt corrective action" under Cal. Gov't Code section 12940*(j)(1)*, an element for establishing employer liability on a claim of harassment by a non-supervisor, *not* the separate statutory violation of failing to take all reasonable steps necessary to prevent discrimination and harassment from occurring under section 12940*(k)*.

United States District Court
Northern District of California

lack of an investigation was a failure to meet defendant's obligation to take reasonable steps to prevent harassment for purposes of plaintiff's Fourth Claim, the case law supports it. *Id.* at 1155.

The Court finds no error in the Substantial Motivating Reason or Failure to Prevent instructions, and therefore no prejudice arising from them.

## C. Erroneous Instructions on Damages Standards

### 1. Instruction on Types of Damages

Defendant next argues that the Court's instructions on damages were ambiguous and confusing and resulted in clear error. Defendant contends the Court's efforts to cure its initial erroneous instructions on a type of damages that was not recoverable only served to further confuse the jury. The Court disagrees.

After extensive discussion, the parties and Court agreed to bifurcated deliberations on liability versus damages. (*See* Trial Tr. Vol. 3 at 621-627, 823-828.) In anticipation thereof, the parties and Court discussed which instructions would be needed depending on the jury's verdict as to liability. However, none anticipated which instructions would be eliminated if the jury found for plaintiff on the harassment and failure to prevent claim, but for the defense on the discrimination and retaliation claims. Accordingly, after the jury returned its verdict on liability in Phase I, the Court proceeded to instruct the jury orally on the various types of damages plaintiff could recover based upon the agreed-upon instructions. The jurors did not have a printed copy of these instructions at that time.[9] Neither counsel interjected during the reading. As the Court began instructing the jury that plaintiff could recover past and future lost earnings and explaining the meaning of past lost earnings and future lost earnings (Trial Tr. Vol. 8 at 1249-50), it became apparent that the instruction was improper. Appropriately, defense counsel raised an objection. The objection was made after the Court finished reading the instructions aloud, and out of the presence of the jury, but before the parties made their closing arguments on damages.

The Court then had a discussion with counsel outside of the presence of the jury and gave counsel an opportunity to research authority applicable to the circumstances. (Trial Tr. Vol. 8 at

---

[9] The Court prefaced the damages instructions with "now, I have more instructions for you. Because I didn't know what your verdict was going to be, I don't have [paper] copies for you, but I will send copies in. Okay?" (Trial Tr. Vol. 8 at 1248:12-14.)

1255:17-1258:17.)  The parties and Court agreed that the jury needed to be re-instructed that

economic damages did not apply.  (*Id.* at 1258:7-17.)[10]  The Court did so.  The Court called the jury

back to instruct them verbally that:

> In light of your decision, I have conferred with the lawyers and I am going to
> amend the instructions that I just gave you.  First of all, because you only found
> on the harassment claim and the failure to prevent based upon question one, the
> only measure of damages that are actually recoverable are past and future mental
> suffering and emotional distress.  So past lost earnings and future lost earnings are
> actually not recoverable given your findings.  So my instructions relative to the
> emotional distress are the ones that apply here.  I'm going to allow the attorneys
> to do their argument on that basis, and I will be back -- I'll have more to say to
> you after they are done with their argument.

(*Id.* at 1259:4-17.)  With the appropriate instructions in mind, counsel made a second round of

closing arguments on damages specifically.  The Court then gave the jurors a printed copy of the

corrected damages instructions and stated:

> The Court:  Thank you. All right. Ladies and gentlemen, if the courtroom deputy
> will pass out these instructions, I just want to flip through them with you again so
> that I don't have to – I'm not going to reread them to you omitting certain
> materials, but I do want you to flip through them with you.
>
> (Documents handed to counsel and jury.)
>
> The Court: All right.  So you have your copy there.  So as you can see, the
> introduction is -- to damages is the same about having acknowledged your
> decision to award damages and the attorneys' arguments are not damages and the
> attorneys' fees and expenses do not -- are not to be considered.  There are still two
> legal theories, right, because you found on two claims, but the only available
> damages, as the attorneys have argued, are for emotional distress past and future.
> So everything I said about the economic damages, I've taken it out.  It doesn't
> apply.  The avoidable consequences, which is the next page, still applies.  And
> then I read you a full page about mitigation of damages.  That all related to
> economics.  You don't see that in there because it doesn't apply.  All right?

(*Id.* at 1295:23-1296:19.)  The jury responded physically that they understood in response to the

Court's inquiry.  The Court also provided the jury with a verdict form which allowed for the award

of damages for past and future mental suffering and emotional distress *only*.  (Dkt. No. 253.)

---

[10]  After the Court provided corrected instructions and the parties concluded their closing
arguments, plaintiff's counsel indicated that she had found other case law allowing economic
damages under these circumstances.  However, the Court declined to consider any additional
changes to the instructions at that point and informed plaintiff's counsel that she would have to take
it up in a post-trial motion.  (Trial Tr. Vol. 8 at 1297:24-1298:9.)  Plaintiff did not raise the issue
post-trial.

United States District Court
Northern District of California

Defendant contends that the Court's statements to the jury could not cure the initial error in providing economic damages instructions.[11] The Court disagrees. First, the Court presumes that the jury followed the instructions they were given, including the timely and thorough correction that no damages for lost wages were permitted. Second, the Court verbally corrected the instructions *before* the parties gave their closing arguments which focused solely on the proper measure of damages. Third, the paper version of the instructions given to the jury at the conclusion of the arguments, and before they began their deliberations on Phase II, provided the corrected version of the damages instructions. The care with which the Court explained what was and what was not a proper measure of damages assures that the jury acted properly.

Here, the court took all appropriate steps to correct and cure the initial error without undue emphasis on the error. Defendant's suggestion that the error could not be cured with an appropriate correction is contrary to Ninth Circuit authority. *See Seltzer v. Chesley*, 512 F.2d 1030, 1036 (9th Cir. 1975) ("To follow appellants' advocacy of a rule of absolute incurability of an erroneous instruction on contributory negligence would not only frustrate the purpose of Rule 51 of the Federal Rules of Civil Procedure, but would also diminish the integrity of the federal jury trial system."). The Court finds that the correction of the damages instructions did not confuse or mislead the jury, and defendant was not prejudiced by the correction. Thus, the correction provides no basis for a new trial and the motion on these grounds is denied.

---

[11] The Court notes that, even after the parties had discussed the correction with the Court and the Court had instructed the jury that economic damages were no longer at issue, defense counsel proceeded to include demonstratives that included economic damages in his closing arguments:

> **Mr. Lafayette: . . .** I think this is the form that you guys get to, and this is where I have to talk about --
> **The Court:** That will be revised or has been revised.
> **Mr. Lafayette:** I don't have --
> **The Court:** That's fine. You can use it, but because economic damages are not at issue --
> **Mr. Lafayette:** Yes, I understand, your honor.
> **The Court:** -- It will be taken out. Go ahead.
> **Mr. Lafayette:** Thank you. I am striking out 2 because 2 is no longer with us. Okay?

(Trial Tr. at Vol. 8 at 1287.)

### 2. *Mitigation Instruction Premised on Supervisor Liability*

Defendant next argues that the Court erred in its instruction on the avoidable consequences doctrine when the Court indicated not only that the jury had found harassment (which it had) but that a supervisor perpetrated the harassment. Defendant did not preserve this objection as required by Rule 51(d) and fails to show that the instruction was improper or resulted in any prejudice.

When the damages instructions initially were read aloud to the jury, as part of the instruction on defendant's affirmative defense under the Avoidable Consequences Doctrine, the Court stated, in part:

> With respect to her first claim in which you found in favor of her, the following instruction applies. And, again, you will have all this in writing inside the jury room. If Ciara Newton proves, *as you have found*, that a supervisor harassed her based on her gender, defendant Equilon Enterprises is responsible for harm to Ciara Newton caused by that harassment . . . .

(Trial Tr. Vol. 8 at 1251:6-12, emphasis supplied.) The avoidable consequences affirmative defense instruction provided to the jury in writing stated:

**Avoidable Consequences Doctrine**

This instruction applies only to any finding in favor of plaintiff with respect to her First Claim for Gender-Based Harassment.

If Ciara Newton proves that a supervisor harassed her based on her gender, defendant Equilon Enterprises, LLC dba Shell Oil Products US is responsible for harm to Ciara Newton caused by the harassment.

However, defendant claims that Ciara Newton could have avoided some or all of the harm with reasonable effort. To succeed, defendant Equilon Enterprises, LLC dba Shell Oil Products US must prove all of the following:

1. That defendant took reasonable steps to prevent and correct workplace gender harassment;

2. That Ciara Newton unreasonably failed to use the preventive and corrective measures for gender harassment that defendant provided; and

3. That the reasonable use of defendant's procedures would have prevented some or all of Ciara Newton's harm.

You should consider the reasonableness of Ciara Newton's actions in light of the circumstances facing her at the time, including her ability to report the conduct without facing undue risk, expense, or humiliation.

(Dkt. No. 250 at 3; *see also* Trial Tr. Vol. 8 at 1251:6-1252:2.)

Again, the jury was provided with a written copy of the instructions before it began its deliberations and the Court referred the jury to the written copy expressly. Defense counsel raised no objection to the "as you have found" statement at the time it was made, the time of the sidebar discussion regarding the economic loss instructions, or any time prior to the verdict when the Court might have been able to make a verbal correction to the instruction. *See* Fed. Rule Civ. P. 51(d) (party may assign error if instruction given and party objected).

Moreover, any confusion was harmless. The jury had already been instructed that it could not hold defendant liable for harassment unless the perpetrator was a supervisor, or a "supervisor or agent of the defendant knew or should have known of the harassing conduct and failed to take immediate and appropriate corrective action." (Dkt. No. 238 at 8.) The jury had already found liability. The instruction concerned a defense to ***reduce*** defendant's damages if the harassing conduct was committed by a supervisor. Indeed, any misunderstanding the "as you have found" instruction might have precipitated—*i.e.*, that the harassment the jury had already found was perpetrated by one or more supervisors—would only have worked ***in favor of*** defendant at the damages phase, since the avoidable consequences instruction provides the jury with a basis for *reducing* damages when there would otherwise be strict liability for defendant based on the conduct of a supervisor.[12] Thus, any error in the Court's instruction could not have prejudiced defendant.

## D. Damages Award Excessive and Unsupported

To warrant a new trial on the ground that the jury awarded "excessive damages," the award must be "grossly excessive or monstrous," *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1041 (9th Cir. 2003). The Ninth Circuit does not require emotional distress damages cases to be supported by objective evidence, such as economic losses, physical or mental health symptoms or treatment, but may be supported by observation of others, appropriate inferences from the circumstances, or solely by plaintiff's own testimony. *See Passantino v. Johnson & Johnson Consumer Prod., Inc.*, 212 F.3d 493, 513 (9th Cir. 2000); *Zhang*, 339 F.3d at 1040.

---

[12] Moreover, the perpetrators of harassing conduct plaintiff identified were supervisors (Fischer, Perez and Metcalf), since the perpetrator of the "stay home" sticker was never discovered.

In diversity jurisdiction actions, the court applies state law regarding excessiveness. *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 429-31, 434-36 (1996). Under California law, "there is no fixed or absolute standard by which to compute the monetary value of emotional distress," and a "jury is entrusted with vast discretion in determining the amount of damages to be awarded." *Plotnik v. Meihaus,* 208 Cal.App.4th 1590, 1602 (2012). "It is the members of the jury who . . . are in the best position to assess the degree of the harm suffered and to fix a monetary amount as just compensation therefor." *Agarwal v. Johnson,* 25 Cal.3d 932, 953 (1979) (disapproved on other grounds in *White v. Ultramar, Inc.,* 21 Cal. 4th 563 (1999)). The court will not overturn a jury's determination in the absence of a showing that the damages are incorrect as a matter of law or the product of "passion, prejudice, or corruption on the part of the jury." *Plotnik*, 208 Cal. App. 4th at 1602.

Here, there is ample evidence to support the jury's emotional distress damages award. The jury heard plaintiff's testimony that she felt threatened, worried, and upset by her supervisors' treatment. They heard her testimony that she felt humiliated and embarrassed due to the "go home" sticker incident. The jury also heard testimony from other employees about the offensive and shocking nature of the sticker incident, supporting an inference of regarding the degree of plaintiff's emotional distress. (Trial Tr. Vol. 1 at 136-37 [Wesselman]; Vol. 4 at 752 [Jones]; Vol. 5 at 870-71 [Metcalf].) Further, defendant has provided no objective measure upon which the Court could or should change the jury's evaluation of the emotional distress damages. The Court cannot find that the award here is excessive as a matter of law.[13]

---

[13] Defendant's contention that emotional distress damages were excessive is undermined by its own closing argument in which it suggested that plaintiff's wages were a proper reference point for assessing that amount. Equilon's counsel argued:

> We award Ciara Newton damages for past and future mental suffering and emotional distress. So, here, how much do you award someone? How much money did she make? That's one thing you can look at. You say, okay, she went to work every day. She made x amount of dollars when she was working there and maybe we pay her that. Or maybe we pay her a fraction of that. Maybe we pay her $25,000. Maybe. It's up to you. But you don't have a benchmark and you don't have a guide. All you know is how much money she made, and maybe you use that as your guide.

(Trial Tr. Vol. 8 at 1287-88.)

**E. Prejudicial Misconduct by Plaintiff's Counsel**

Finally, defendant argues that it is entitled to a new trial because of plaintiff's counsel's prejudicial misconduct. A new trial is warranted on the ground of attorney misconduct during the trial where the "flavor of misconduct . . . sufficiently permeate[s] an entire proceeding to provide conviction that the jury was influenced by passion and prejudice in reaching its verdict." *Anheuser-Busch, Inc. v. Nat. Beverage Distributors*, 69 F.3d 337, 346 (9th Cir. 1995) (internal citation omitted). Conduct may be said to "permeate" the proceedings even if it occurs only at the end of a trial or in closing statements. *Bird v. Glacier Elec. Coop., Inc.*, 255 F.3d 1136, 1145 fn. 16 (9th Cir. 2001). However, the court considers the likely prejudice from the conduct in light of the "totality of circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, the manner in which the parties and the court treated the comments, the strength of the case, and the verdict itself." *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1193 (9th Cir. 2002).

The remedy of a new trial based upon an attorney misconduct during closing arguments is available only in an extraordinary case. *Id*. "The federal courts erect a 'high threshold' to claims of improper closing arguments in civil cases raised for the first time after trial." *Id*. A "high threshold" is warranted, in part, because "allowing a party to wait to raise the error until after the negative verdict encourages that party to sit silent in the face of claimed error." *Id*.

Defendant claims attorney misconduct on a number of grounds. Defendant urges that plaintiff's counsel misrepresented to the jury the reasons for plaintiff's distress, switching from distress regarding termination in her original closing to characterizing plaintiff's distress as related to harassment once it was clear the termination-based claims had been decided against plaintiff. However, as stated above, there was ample evidence from which the jury could find emotional distress and reach their award. The jury could consider evidence offered in support of discrimination claims in connection with the harassment-related claims. Counsel's arguments did not amount to misconduct. Moreover, no claim of misconduct was raised at the time.

Further, defendant contends that plaintiff's counsel improperly argued to the jury that defense counsel was trying to mislead them. The arguments referenced by defendants concern the parties'

differing interpretations of when the qualification checklist white-out incident occurred. The arguments were well within the range of allowable advocacy, and defendant did not raise this supposed misconduct at the time.

Finally, defendant maintains that plaintiff counsel improperly argued the jury should base its damages award on plaintiff's lost wages, which could only properly be awarded in connection with the termination-related claims she had already lost or dismissed. In plaintiff's counsel's closing on the damages issue, counsel stated:

> You've heard a little bit about an amount. Again, I said we trust you to come up with an amount. And you know now economic damages are not in the case. That is usually some way to . . . To peg some amount. Again, we are going to trust you to come up with it.
>
> This is the only way that you are going to compensate Ms. Newton for going into that refinery every day, into an environment where she felt intimidated and threatened from the beginning, and she kept trying to work hard, she caught up on her own after her father's death. She complains and complains and complains, and then that sticker on her desk. So you need to compensate her for that. You need to finally, finally, finally make Shell take responsibility.
> And so whether that is something in the neighborhood of what her past lost wages are, $250,000, or double that, $500,000, or maybe you think Shell needs to pay more to compensate her for that for going through that, or less, it's up to you. And we trust you. And once again, the case is in your hands.

(Trial Tr. Vol. 8 at 1295.) The Court finds nothing improper about plaintiff's argument, particularly given that defendant's argument on the amount of emotional distress damages offered a similar formulation based on plaintiff's lost wages.

Defendant particularly calls out plaintiff's counsel's statement to the jury that it should "send a loud and clear message to Shell." (Trial Tr. Vol. 8 at 1266:23-25.) Plaintiff's counsel made this statement in the context of arguing to the jury that it should answer "yes" to the question on the verdict form about whether Mike Beck was an officer, director, or managing agent of Shell who authorized or ratified the conduct of an agent or employee who acted with malice, fraud, or oppression. (*Id*. at 1265:9-1267:2.) Defendant also contends that plaintiff's counsel's conduct was an attempt to circumvent the clear and convincing showing of each element California law requires for punitive damages awards California Civil Code section 3294(b). Given that the jury answered "No" to the question of whether Mike Beck was a managing agent who knew of, authorized, or ratified the conduct, and therefore no punitive damages were awarded in this action, the Court cannot

1    find that this statement to the jury prejudiced defendant or warrants a new trial or remittitur on the

2    emotional distress damages awarded.

3         In sum, defendant has not met its burden to justify an order for a new trial based upon

4    misconduct by plaintiff's counsel.

5    **PLAINTIFF'S MOTION FOR ATTORNEYS' FEES**

6         Plaintiff moves for an award of attorneys' fees incurred in the litigation of this action

7    pursuant to Cal. Gov't Code section 12965(b).  Plaintiff's lodestar calculation is based upon 1797.25

8    hours of billable attorney and paralegal time at rates from $175 per hour for paralegal time to $700

9    per hour for a highly experienced employment litigator.  Plaintiff seeks a 1.75 multiplier on the

10   lodestar to compensate her for the contingency risk in litigating the case as well as the skill required

11   by the litigation and the result obtained.

12        Having carefully considered the papers filed in support and in opposition to the motion, and

13   the admissible evidence,[14] and for the reasons stated below, the motion is **GRANTED IN PART**.

14   **I.   BACKGROUND FACTS RELEVANT TO FEE MOTION**

15        Plaintiff filed the complaint in this case on July 13, 2017.  Following the initial case

16   management conference on October 23,2017, and the completion of initial disclosures, the parties

17   commenced written discovery. Defendant's counsel deposed Plaintiff on January 16 and 29, 2018.

18   Plaintiff's counsel deposed six of defendant's employees between February 2018 and June 2018, in

19   addition to propounding and responding to other discovery, and litigating discovery disputes related

20   to dilatory responses by defendant, requiring Court intervention on three occasions.  On July 17,

21   2018, defendant filed a Motion for Summary Judgment or in the Alternative, Partial Summary

22   Judgment, which plaintiff opposed on July 31, 2018. The Court denied defendant's motion in its

23   entirety.  After two unsuccessful attempts to resolve the matter via a Court-appointed mediator and a

24   settlement conference with a Magistrate Judge, the case proceeded to trial in December 2018.  After

25

26

27        [14]  Defendant objects to the reply declarations submitted by Nugent, Smallets, and Ettinghoff.
     The objections are **OVERRULED**.  A party may submit a declaration on reply to respond to matters
28   raised in opposition.  Likewise, defendant's objection to portions of plaintiff's reply brief is
     **OVERRULED**.

trial, the parties attended a third settlement conference conducted by Magistrate Judge Sallie Kim on January 23, 2019.

## II. BASIS FOR FEE REQUEST

Plaintiff requests compensation for all work performed in this case and in connection with the fee motion as follows:

| Biller | Hourly rate | Hours on Case | Subtotal on Litigation | Hours on fee motion | Subtotal on fee motion |
|---|---|---|---|---|---|
| Sonya L. Smallets | $600 | 764.2 | $458,520.00 | 12.3 | $7,380.00 |
| Evan R. Ettinghoff | $350 | 596.4 | $208,740.00 | 35.1 | $12,285.00 |
| Emily Nugent | $525 | 363.52 | $190,848.00 | 8.65 | $4541.25 |
| Kathy Dickson | $700 | 56.93 | $39,851.00 | -- | -- |
| Denise Kwan (paralegal)[15] | $175 | 58.25 | $10,193.75 | -- | -- |
| | | 1893.3 | $908,152.75 | 56.05 | $24,206.25 |

Plaintiff's counsel indicates they reduced the lodestar request by 87.95 hours of attorney time spent on the case in the exercise of billing judgment to eliminate potential redundancy. Plaintiff's counsel also reduced the lodestar by 150 hours of additional paralegal time, estimated at an hourly rate of $195/hour and valued at approximately $30,000. (Smallets Decl. ¶ 18.) Plaintiff requests a total lodestar of $908,152.75 on the litigation plus a lodestar for time spent on the fee motion of $24,206.25.

In addition, plaintiff seeks costs for expert witness fees, permitted by Cal. Govt Code 12956(b), for damages expert Nora Ostrofe totaling $14,226.25, as well as litigation consulting fees for Karen Jo Koonan totaling $6,162.79. These costs were disallowed in plaintiff's bill of costs.

## III. APPLICABLE STANDARD

Both federal and California courts have adopted the lodestar method for calculating reasonable attorneys' fees. *Perdue v. Kenny A. ex ref. Winn,* 559 U.S. 542, 546 (2010); *Chavez v. City of Los Angeles,* 47 Cal.4th 970, 984-85 (2010). A lodestar figure is the product of the hours

---

[15] Legal assistant time is compensable as part of the attorneys' fee award. *See Guinn v. Dotson,* 23 Cal.App.4th 262, 268-270 (1994).

counsel reasonably spent on the case and a reasonable hourly rate. *Nichols v. City of Taft,* 155 Cal.App.4th 1233, 1242-43 (2007). In determining the reasonableness of the lodestar, the Court looks to the following factors: (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Kerr v. Screen Extras Guild, Inc.,* 526 F.2d 67,70 (9th Cir. 1975).

Once the Court has determined the lodestar figure, to the extent the *Kerr* factors are not addressed in it, the Court has the discretion to apply a fee enhancement. *Ketchum v. Moses* 24 Cal. 4th 1122 (2001) (holding that the lodestar adjustment approach is applicable to California fee-shifting statutes). "In effect, the court determines, retrospectively, whether the litigation involved a contingent risk or required extraordinary legal skill justifying augmentation of the unadorned lodestar in order to approximate the fair market rate for such services." *Id.* at 1132. A court must be mindful of the possibility of double counting a trial court should "award a multiplier for exceptional representation only when the quality of representation far exceeds the quality of representation that would have been provided by an attorney of comparable skill and experience billing at the hourly rate used in the lodestar calculation." *Id.* at 1139.

**IV. DISCUSSION**

**A. Reasonableness of Lodestar**

*1. Hours*

Defendant contends that the hours sought here are excessive. Specifically, defendant argues that excessive amounts of time were spent in the pre-trial phase of the litigation; some paralegal tasks such as creating witness and pretrial binders were billed as attorney time; and duplicative hours were billed on appearances at hearings.

Defendant argues that hours were devoted to claims on which plaintiff did not prevail and that the attorneys' fees should be reduced by a measure of the percentage of claims on which she was successful. The Supreme Court rejected the mathematical approach to fee calculations based defendant asserts, instead holding that a "fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit . . . [; t]he result is what matters." *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983). "If, on the other hand, a plaintiff has achieved only partial or limited success," the lodestar amount may not be reasonable, even if the claims were "interrelated, nonfrivolous, and raised in good faith." *Id.* at 436. Under Ninth Circuit authority, "before hours may be deducted for unsuccessful claims, the claims must be suitable for entirely separate lawsuits," "distinct in both fact and law," and provide no "aid in proving the successful claims." *Muniz v. United Parcel Serv., Inc.,* 738 F.3d 214, 224 (9th Cir. 2013).

Here, several of plaintiff's claims were based upon a common core of facts and challenged a single course of conduct by her supervisors. Plaintiff's unsuccessful gender discrimination claim was based largely on the same evidence that supported plaintiff's harassment claim. However, the facts and law related to her unsuccessful Labor Code whistleblower claim were largely distinct from her claims under FEHA and for wrongful termination, and do not appear to have aided the jury's resolution of her successful harassment-related claims. On this basis, the Court finds it appropriate to reduce plaintiff's lodestar on the fees incurred in the litigation by 10% (*i.e.*, 10% reduction of $908,152.75) to account for the limits to plaintiff's success on the full range of her claims. *Hensley*, 461 U.S. at 437.

However, defendant's argument that the Court should disallow time spent by the attorneys conferring with and preparing their damages expert is without merit. For the same reasons as the Court declines to reduce the fees incurred on other aspects of litigating the unsuccessful discrimination claims, it declines to disallow time spent on remedies to those claims. Moreover, as indicated above, the calculation of plaintiff's lost wages was used by both parties' in their closing arguments on emotional distress damages. Nor does the Court does find merit in defendant's contention that the majority of the hours claimed are duplicative and unreasonable. Having reviewed in detail the billing records submitted, the Court finds the hours requested to be fair and reasonable.

Finally, defendant argues that plaintiff pursued claims she had no reason to believe were viable. However, defendant's argument is belied by its failure to prevail at summary judgment.

### 2. Rates

The lodestar should be calculated by using hourly rates that are the "rate prevailing in the community for similar work performed by attorneys of comparable skill, experience, and reputation." *See, e.g., Camacho v. Bridgeport Fin., Inc.,* 523 F.3d 973, 979 (9th Cir. 2008) (citation omitted). "Generally, when determining a reasonable hourly rate, the relevant community is the forum in which the district court sits." *Prison Legal News v. Schwarzenegger,* 608 F.3d 446, 454-55 (9th Cir. 2010) (citing *Camacho,* 523 F.3d at 979). In calculating the lodestar, it is appropriate for counsel to use their current hourly rates at the time of the fee motion. *See, e.g., In re Washington Pub. Power Supply Sys. Sec. Litig.,* 19 F.3d 1291, 1305 (9th Cir. 1994) (noting that "[f]ull compensation requires charging current rates for all work done during the litigation, or by using historical rates enhanced by an interest factor").

Here, plaintiff offers evidence that the rates used to calculate counsel's lodestar are in line with the rates currently charged by counsel with similar experience, reputation, and ability litigating employment cases in Northern California, as well as rates counsel has been awarded in previous cases. For example, the rates sought here are in line with market rates for Bay Area labor and employment litigators in other actions. *See, e.g., Zoom Elec., Inc. v. Int'l Bhd. of Elec. Workers, Local 595,* No. C 11-1699 CW, 2013 WL 2297037, at *4 (N.D. Cal. May 24, 2013) ("reasonable market rates in labor and employment cases are $675 per hour for partners, between $300 and $400 per hour for associates, and between $180 and $225 per hour for law clerks and paralegals."); *Davis v. Prison Health Servs.,* No. 09-cv-2629 SI, 2012 WL 4462520, at *9 (N.D. Cal. Sept. 25, 2012) (awarding fees of $750 and $675 to attorneys with "considerable experience litigating civil rights and employment cases" and finding that the "rates [we ]re in line with the overall market rate for experienced civil rights attorneys of similar abilities and experience in the Northern District"); *Campbell v. National Passenger R.R. Corp*., 718 F. Supp. 2d 1093 (N.D. Cal. 2010) (finding reasonable $700 hourly rate for lead counsel in employment discrimination case, and support for "a

market rate from $380 to $775 per hour for experienced employment and civil rights attorneys in the Northern District" for the years 2006- 2009).

Defendant contends that the rates sought here are "exorbitant" and "unsubstantiated" relative to rates for "non-contingent Bay Area employment litigators" and to the experience, expertise, and skill of the work performed. However, defendant offers no basis for those objections other than counsel's own unsupported opinion.

Based upon the evidence submitted, the comparator cases, and the Court's own knowledge of the market, the Court finds that the hourly rates sought here are reasonable.

**B. Fee Enhancement**

Plaintiff seeks a fee enhancement multiplier of 1.75, arguing that such an enhancement is justified by the contingent nature of the case, the delay in payment of fees, and the public interest value of the litigation. Defendant contends plaintiff is not entitled to any fee enhancement multiplier, criticizing the quality of the representation.[16]

Exercising its discretion, the Court does not find a multiplier justified under the circumstances of this case. "The lodestar amount is presumptively the reasonable fee amount, and thus a multiplier may be used to adjust the lodestar amount upward or downward only in 'rare' or 'exceptional' cases, supported by both specific evidence on the record and detailed findings . . . that the lodestar amount is unreasonably low or unreasonably high." *Van Gerwen v. Guar. Mut. Life Co.*, 214 F.3d 1041, 1045 (9th Cir. 2000) (internal citation omitted). "[T]he trial court is not *required* to include a fee enhancement to the basic lodestar figure for contingent risk, exceptional skill, or other factors, although it retains discretion to do so in the appropriate case; moreover, the party seeking a fee enhancement bears the burden of proof." *Ketchum*, 24 Cal.4th at 1138 (emphasis in original).

Here, plaintiff prevailed only on her harassment-related claims, not her discrimination and retaliation claims. The claims themselves were not novel or complex and did not require exceptional skill in their litigation, nor were the results obtained particularly exceptional. While the litigation was contentious, and the matter required at least some of plaintiff's counsel to forego other work,

---

[16] Defendant also accuses plaintiff and her counsel of perjury and suborning perjury. The Court finds defendant's arguments strain credulity and, given defendant's own obstreperous tactics taken pretrial, rejects the same.

plaintiff's lodestar hours fairly compensate her counsel for those considerations. Likewise, the contingency risk here was mitigated by the fact that the action proceeded to trial less than 18 months from the date it was filed. Moreover, while plaintiff's individual case is important, plaintiff does not establish that the verdict significantly advanced the public interest. *Cf. Navarro v. DHL Global Forwarding*, 15-cv-05510-CAS(Ex), 2018 WL 2328191 at *5 (C. D. Cal. May 21, 2018) (declining to fee award enhancement in FEHA disability discrimination where jury returned verdict for plaintiff on all five claims and awarded him $1,530,000 in damages).

In exercise of its discretion, and considering all factors presented, the Court finds that the lodestar as adjusted above fairly compensates counsel for their work on this case and no multiplier is warranted. Therefore, plaintiff is awarded attorneys' fees in the amount of **$841,43.73**.

## C. Expert Witness Fees

Finally, plaintiff seeks fees incurred for expert witness fees Nora Ostrofe ($14,226.25) and litigation consulting fees for Karen Jo Koonan ($6162.79) disallowed costs in their costs bill. Such costs are permitted by the FEHA statute 12965(b) ("the court, in its discretion, may award to the prevailing party reasonable attorney's fees and costs, including expert witness fees . . . ."). A federal court has discretion to award such costs under FEHA. *Bouman v. Block,* 940 F .2d 1211, 123 (9th Cir. 1991). Defendant's objection to this request seems to misunderstand it as being part of the lodestar calculation. The Court agrees that the fees are not part of the lodestar, and to the extent that plaintiff's appendices so suggested, they are incorrect. The Court finds the costs recoverable under FEHA and awards them.

Based on the foregoing, plaintiff is awarded expert and litigation consultant fees not awarded on her costs bill in the amount of **$20,389.04**.

## PLAINTIFF'S MOTION FOR REVIEW OF TAXATION OF COSTS

Plaintiff moves for review of the clerk's taxation of costs pursuant to Federal Rule of Civil Procedure 54(d)(1). Having duly considered the papers in support and opposition thereto, and the trial presentation in this matter, the motion is **GRANTED IN PART** as set forth herein.

After a jury trial in December 2018, and a verdict in plaintiff's favor on two of her six claims and an award of $475,000.00 in damages, plaintiff submitted a Bill of Costs to the clerk seeking to

recover costs incurred in litigating the case, to which defendant objected.  Defendant filed its own

bill of costs on May 20, 2019.  The Clerk disallowed all of defendant's costs on the basis that it was

not the prevailing party.  On June 10, 2019, the clerk taxed costs against defendant in the amount of

$15,696.79.  Plaintiff now seeks review of the court clerk's decision disallowing costs incurred for

daily trial transcripts ($7,406.34)[17] and video depositions ($5885.63).[18]

Recoverable costs are defined generally by 28 U.S.C. § 1920, and include the following:

> (1) Fees of the clerk and marshal;
> (2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;
> (3) Fees and disbursements for printing and witnesses;
> (4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;
> (5) Docket fees under section 1923 of this title;
> (6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

The Northern District of California Local Rule 54-3 further defines each category of taxable costs.

The Court considers each category of costs disallowed by the clerk in turn.

### A.  Transcripts

The cost of transcripts is recoverable so long as such transcripts are "necessarily obtained for

use in the case." 28 U.S.C. § 1920(2).  The Northern District Local Rules specify that such costs

include those for transcripts "necessarily obtained for an appeal," "approved by a Judge," or

"stipulated to be recoverable by counsel." N.D. Cal. L.R. 54-3(b)(1), (3).

Here, plaintiff obtained transcripts in anticipation of an appeal and used them during closing

argument to focus the jury on important testimony and evidence, and in opposing defendant's Rule

50 motions.  *See Kranson v. Fed. Express Corp.,* No. 11-CV-05826-YGR, 2013 WL 6503308, at *13

(N.D. Cal. Dec. 11, 20 13) (awarding costs of trial transcripts, including shipping and handling fees

and videographer parking costs, and defendant did not oppose); *Vectren Commc'ns Servs. v. City of

Alameda,* No. C 08-3137 SI, 2014 WL 3612754, at *3 (N.D. Cal. July 22, 2014) (finding that

---

[17]  Plaintiff, in reply, withdrew her request for costs of $477.25 for a written transcript and an audio recording of the summary judgment hearing.  Review of the disallowance of those costs is denied.

[18] In reply, plaintiff conceded that costs of videotape syncing ($207.39) are not recoverable per *Kalitta Air L.L.C. v. Cent. Texas Airborne Sys. Inc.,* 741 F.3d 955, 958-59 (9th Cir. 2013).  Review of the disallowance of these costs is denied.

reporters' transcript costs were recoverable when both sides made extensive use of the transcripts during closing arguments, post-trial motions, and in anticipation of appeal). *Berndt v. California Dep't of Corr.,* No. 1:03-CV-03174-NJV, 2016 WL 3548361, at *2 (N.D. Cal. June 15, 2016) (finding that daily transcripts were necessarily obtained for Rule 50 motion made during trial), aff'd in part, rev'd in part and remanded sub nom *Berndt v. California Dep't of Corr. & Rehab.,* 715 F. App'x 593 (9th Cir. 2017); *Golden Bridge Technology, Inc. v. Apple Inc.,* No. 5:12-CV-04882-PSG, 2015 WL 13427805, at *2 (N.D. Cal. Dec. 21, 2015) (awarding expedited and realtime costs for trial transcripts, as they were necessary to avoid delay of objections and motions during trial, and because the transcripts were used for briefing and motions for judgment as a matter of law). Defendant sought the similar costs in its bill of costs, conceding their necessity.

The Court finds these costs reasonably necessary and awards them to plaintiff.

**B.     Videotaped Depositions**

Plaintiff seeks to recover for the cost of five videotaped depositions. Northern District Local Rule 54-3 provides that, "[t]he cost of an original and one copy of any deposition (including videotaped depositions) taken *for any purpose* in connection with the case is allowable." N.D. Cal. L.R. 54-3(c)(l) (emphasis added).

Here, plaintiff played clips of these videotaped depositions at trial for purposes of impeachment. *See Kranson,* 2013 WL 196503308, at * 13 (awarding costs for five deposition videos because they "ultimately aided in plaintiff's presentation of evidence at trial"). Defendant sought similar costs in its costs bill. These costs are reasonable and necessary and shall be awarded to plaintiff.

**C.     Conclusion on Review of Taxation**

For the reasons stated above, the Court **ORDERS** that defendant shall pay to plaintiff the costs incurred in the amount of $7,406.34 for trial transcripts and $5,885.63 for videotaped depositions.

## CONCLUSION

Therefore, as stated herein, the renewed motion for judgment as a matter of law, or in the alternative for a new trial, for remittitur, or to alter or amend the judgment is **DENIED**.

United States District Court
Northern District of California

No later than **September 27, 2019**, plaintiff shall submit an amended form of judgment reflecting an award of reasonable attorneys' fees in the amount of **$841,543.73** plus expert and litigation consultant fees in the amount of **$20,389.04**; **$7,406.34** for trial transcripts; and **$5,885.63** for videotaped depositions.

This terminates Docket Nos. 292, 304, and 332.

**IT IS SO ORDERED.**

Date: September 18, 2019

**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT JUDGE**